## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LATASHA A. RAYFORD, as
Guardian of LAVONTE D.
RAYFORD, a Disabled Person,

      **Plaintiff,**

v.                                                    **Case No. 21-CV-00952-SPM**

SHERRI RIDER and KYLE HEINS,

      **Defendants.**

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendants Sherri Rider and Kyle Heins. (Doc. 85). Plaintiff Latasha Rayford filed a Response. (Doc. 97). Having been fully informed of the issues presented, the Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Latasha Rayford is the court-appointed guardian of Lavonte Rayford, who is disabled and wears a covering on his head at all times "to provide protection to his scalp and for his emotional well-being" due to severe burns sustained from a car accident during his childhood. (*See* Doc. 1, ¶¶ 12, 19). While Lavonte was determined to be fit to stand trial in relation to state charges filed in McLean County, Illinois, the trial court made the determination that Lavonte was in need of mental

health services as an inpatient at a maximum-security facility. (*See id.*, ¶¶ 13, 18). Plaintiff Latasha Rayford alleges that Lavonte "was forcibly assaulted, grabbed, choked, and thrown to the bed by the staff at Chester Mental Health Center" when he refused to remove a towel from his head upon arrival at Chester Mental Health Center ("Chester"). (*Id.*, ¶ 21). Plaintiff Rayford alleges that "[i]mmediately following the incident that occurred on August 14, 2019, Lavonte D. Rayford complained of multiple injuries, including but not limited to difficulty speaking and swallowing, pain in his neck, and his bottom lip shaking" and that Chester failed to notify her. (*Id.*, ¶ 23). Lavonte was released from Chester on August 27, 2019 after it was determined that he was fit to stand trial on August 21. (*See id.*, ¶¶ 34–35). He was released from McClean County Jail on August 28, 2019. (*See id.*, ¶ 36). Plaintiff Rayford also alleges that she refused to sign Chester's consent for medication management (*see id.*, ¶ 16) and that Chester's staff improperly dosed Lavonte's medication (specifically his prescription for Dilantin or Phenytoin, an anti-seizure medication), resulting in his development of "Dilantin toxicity with tremors and shakes [sic] in his hands and body." (*Id.*, ¶ 40).

Plaintiff Rayford filed the instant suit on August 13, 2021 against Defendant Chester as well as Nurse Sherri Rider, Nurse Practitioner Cailee Mueller, and Security Therapy Aide Kyle Heins, who were all employed by Chester at the relevant times. (*See id.*). She alleged four claims: (1) willful and wanton lack of medical attention against Defendants Chester, Rider, and Mueller; (2) deliberate indifference pursuant to 42 U.S.C. § 1983 against Defendants Rider and Mueller; (3) failure to

intervene pursuant to § 1983 against Defendants Heins, Rider, and Mueller; and (4) excessive force pursuant to § 1983 against Defendant Heins. (*See id.*, ¶¶ 42–63).

Chester filed a Motion to Dismiss arguing that it is not a person subject to § 1983 liability and that Plaintiff's claims were barred by the Eleventh Amendment (*see* Doc. 27, p. 2); this Court granted the Motion and dismissed Plaintiff Rayford's claims against Chester with prejudice on November 8, 2021. (*See* Doc. 37). The instant Motion was filed on March 27, 2024. (*See* Doc. 85). While Defendant Mueller also filed a separate Motion for Summary Judgment (Doc. 87), a Consent Motion to Dismiss Defendant Mueller with Prejudice was filed on May 28, 2024 (*see* Doc. 100). Plaintiff Rayford's claims against Mueller were dismissed with prejudice on May 29, 2024. (*See* Doc. 101). The remaining claims before the Court are the claims of willful and wanton conduct, deliberate indifference, and failure to intervene against Defendant Rider and the claims of deliberate indifference and excessive force against Defendant Heins.

## APPLICABLE LAW AND LEGAL STANDARDS

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The non-movant cannot simply rely on its pleadings; the non-movant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994); *Celotex*, 477 U.S. at 323–24).

## ANALYSIS

This Court will address each of the remaining claims in turn, beginning with the constitutional claims.

## I. Deliberate Indifference (Defendant Rider)

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court first recognized
that incarcerated prisoners have a right to receive adequate medical treatment,
concluding that "deliberate indifference to a prisoner's serious medical need violates
the Eighth Amendment's protection against cruel and unusual punishment."
*Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018) (citing *Estelle*, 429 U.S.
at 104–05)). However, "[p]retrial detainees stand in a different position: they have
not been convicted of anything, and they are still entitled to the constitutional
presumption of innocence. Thus, the punishment model is inappropriate for them."
*Id.* (citing *Kingsley v. Hendrickson* 576 U.S. 389, 400 (2015) ("[P]retrial detainees
(unlike convicted prisoners) cannot be punished at all, much less 'maliciously and
sadistically.'" (citations omitted)); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For
under the Due Process Clause, a detainee may not be punished prior to an
adjudication of guilt in accordance with due process of law.")). The Seventh Circuit
has "typically assessed pretrial detainees' medical care (and other) claims under the
Eighth Amendment's standards, reasoning that pretrial detainees are entitled to at
least that much protection . . . 'grat[ing] the Eighth Amendment's deliberate
indifference requirement onto the pretrial detainee situation.'" *Miranda v. County of
Lake*, 900 F.3d at 350 (citing *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010);
*Board v. Farnham*, 394 F.3d 469, 477–78 (7th Cir. 2005); *Cavalieri v. Shepard*, 321
F.3d 616, 620 (7th Cir. 2003)). However, the Supreme Court "disapproved the
uncritical extension of Eighth Amendment jurisprudence to the pretrial setting" in

*Kingsley*, holding "a pretrial detainee bringing an excessive-force claim did not need to prove that the defendant was subjectively aware that the amount of force being used was unreasonable. Rather, the plaintiff needed only to show that the defendant's conduct was objectively unreasonable." 576 U.S. at 396–97.

While originally applied to excessive force cases, the Seventh Circuit extended *Kingsley*'s objective unreasonableness inquiry to pretrial detainees' medical claims in *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018). *See Kingsley*, 576 U.S. at 389 (2015); *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019). "[T]he controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018) (citing *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)). In the first step, the inquiry is "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* At the second step, the inquiry is whether the challenged conduct was objectively reasonable. *Id.* "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*

Defendant Rider argues that "[p]re-trial detainees have a right to adequate medical care under the Fourteenth Amendment, and courts have consistently assessed claims regarding medical care for pre-trial detainees using the same standards for deliberate indifference that are used for an Eighth Amendment claim."

(Doc. 86, p. 11 (citing *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007);
*Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003); *Jackson v. Ill. Medi-Car, Inc.*,
300 F.3d 760, 764 (7th Cir. 2002))). In accordance with the discussion *supra*, this
statement is inaccurate and uses the wrong standard.

Defendant Rider argues that "Plaintiff seeks to establish Dilantin toxicity as
Lavonte's objectively serious medical condition" and that even if "Lavonte suffered
from Dilantin toxicity, and that this would be considered an objective, sufficiently
serious medical condition, Plaintiff's deliberate indifference claim fails because
Plaintiff cannot demonstrate Defendant acted with a sufficiently culpable state of
mind." (Doc. 86, p. 12 (citing *id.*, Ex. B, 52:18–20)). She argues that "the record
demonstrates that Defendant Rider interacted with Lavonte once," that she "did not
adjust Lavonte's Dilantin dosage, or make any decisions regarding the amount or
frequency of the administration of Dilantin to Lavonte while he was housed at
Chester," and that she "did not participate in Lavonte's treatment after August 14,
2019 and "had no knowledge that Plaintiff or Lavonte believed he was being
overmedicated with Dilatin [sic]." (*Id.*, p. 13 (citing *id.*, Ex. D, 15:14–17; 21:3–7;
24:11–25:19; 122:21–24; Ex. K)).

In response, Plaintiff Rayford argues that "[t]here is no doubt that Lavonte
Rayford suffered from objectively serious medical conditions" including "psychotic
disorder, temporal lope epilepsy, traumatic brain injury." (Doc. 98, p. 7). She argues
that "Lavonte Rayford began experiencing quivering in his lip, shaking, and
Phenytoin toxicity" and that she "believes that the evidence will show that Phenytoin

toxicity is a serious medical need that can be caused by its adverse interaction with Depakote." (*Id.*). Plaintiff Rayford states that "Defendant Rider intentionally disregarded the guardian's wishes when she inaccurately stated that the consent to medication was agreeable" and that "Latasha Rayford made clear that she did not consent to any medications and dosages not prescribed by Lavonte's treating providers in Bloomington, Illinois" and that she refused to sign the consent to medication form at Chester. (*Id.*, pp. 7–8). Plaintiff Rayford concludes with the argument that "Defendant Rider had actual knowledge of the risk and made no effort to prevent the harm," that "she acted to further the risk and harm by ignoring the guardian's wishes and failing to utilize the chain of command," and that "Defendant Rider knew that Lavonte Rayford had complex medical needs, of which Latasha Rayford was extremely knowledgeable, and it was unusual for providers to change medications right off the bat." (*Id.*, p. 8).

While the parties used the Eighth Amendment deliberate indifference standard instead of that for Fourteenth Amendment objective reasonableness, *see McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018), the Court will apply the correct standard in its analysis. Recall that the first step is "whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018) (citing *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)). At the second step, the inquiry is whether the challenged conduct was objectively reasonable. *Id.*

First of all, while Plaintiff Rayford tries to conflate *all* of Lavonte's medical conditions to meet the (incorrect) objective standard for deliberate indifference including his "psychotic disorder, temporal lope epilepsy, traumatic brain injury," (*see* Doc. 98, p. 7), her Complaint is clear that she is alleging that Rider caused injury via the incorrect dosage of Dilantin, not from any other medical treatment. (*See* Doc. 1, ¶¶ 30–40). Therefore, the critical issue for her medical care claim is the prescription for Dilantin, not any other medical issue.

Reviewing the records in this case, it is clear that Defendant Rider was not responsible for determining the correct dosage of Dilantin or, indeed, for any of the medication administered to Lavonte Rayford while he was an inpatient at Chester. (*See* Doc. 84, Ex. D, 16:1–16, 25:15–19). Rider clearly states that she "didn't have anything to do with [Lavonte's] medications." (*See id.*, Ex. D, 25:18–19). She testified that a physician is responsible for establishing medications. (*See id.*, Ex. D, 52:7–10). Regarding Plaintiff Rayford's consent to prescribe medication to Lavonte, Rider testified that Cailee Mueller, not Defendant Rider, obtained verbal consent from Plaintiff Rayford. (*See id.*, Ex. D, 55:10–16). While Plaintiff Rayford points to Rider's signature on various admission documents as evidence of her involvement with Lavonte's medical care, she does not dispute Rider's argument that, as a nurse, she was not responsible for adjusting Lavonte's Dilantin prescription. (*See* Doc. 86, ¶ 25 (citing *id.*, Ex. D, 15:14–17; 24:11–25:19)).

In *McCann*, the Seventh Circuit stated that "[t]he record contains no evidence that Nurse Mongan purposely, knowingly, or recklessly administered dangerous

dosages of methadone to McCann." 909 F.3d at 886. "To the contrary, she testified that she administered methadone to McCann in strict compliance with Dr. Cullinan's orders." *Id.* at 886–87. "And, while her efforts in caring for McCann, including by administering the prescribed dosages of methadone, were intentional and deliberate, nothing shows that she foresaw or ignored the potential consequences of her actions— McCann's dying from the over-prescription of methadone." *Id.* at 887. The same is true here. The record is bereft of any indication that Defendant Rider was aware of the potential adverse consequences of Dilantin toxicity and purposefully, knowingly, or recklessly ignored those consequences, causing Lavonte's alleged adverse effects.

Regarding the second step, the *McCann* Court held that "[a] licensed practical nurse like Mongan was able to rely on Dr. Cullinan to determine the proper dosage of methadone to treat the ongoing pain McCann was experiencing from his burn wounds." *Id.* "Hers was not the responsibility to second-guess Dr. Cullinan's medical judgment, especially when nothing about Dr. Cullinan's prescriptions or course of care more generally raised any obvious risks of harm for McCann." *Id.* (citing *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010)). The same is true for Defendant Rider—it was not her responsibility to ensure that the treating physicians or nurse practitioners were prescribing the correct dosage of Dilantin for Lavonte. It was her job to ensure that medications were administered in accordance with the established therapeutic regimen.

Plaintiff Rayford insists that "Defendant Rider knew that Lavonte Rayford had complex medical needs, of which Latasha Rayford was extremely knowledgeable, and

it was unusual for providers to change medications right off the bat." (Doc. 98, p. 8). This sounds more like a negligence or medical negligence claim, "which is insufficient to support a claim for inadequate medical care under the Fourteenth Amendment." McCann, 909 F.3d at 887 (citing *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Dixon v. County of Cook*, 819 F.3d 343, 350 (7th Cir. 2016) (explaining that a plaintiff must "prove facts from which something more than negligence or even medical malpractice can be inferred")).

Therefore, considering the above, Plaintiff Rayford's Fourteenth Amendment medical care claim against Defendant Rider does not survive Rider's Motion for Summary Judgment and must be dismissed.

## II. Excessive Force (Defendant Heins)

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). *Kingsley* established that for an excessive force claim brought by a detainee, the relevant question is whether the force used was objectively reasonable. The plaintiff is not required to prove that the defendant acted with the subjective intent to punish or inflict harm. *Kingsley*, 135 S. Ct. at 2472–74. *See also Bell v. Wolfish*, 441 U.S. 520, 561 (1979) (pretrial detainee may demonstrate constitutional violation where a defendant's actions are not "rationally related to a legitimate nonpunitive governmental purpose" or where the actions "appear excessive in relation to that purpose").

Defendant Heins argues that "there was a need for the application of force" because "[i]t is well-documented that during the intake process, Lavonte refused to take the towel off his head and became verbally aggressive." (Doc. 86, p. 14 (citing *id.*, Ex. C, 47:9–14; Ex. F; Ex. G; Ex. H; Ex. I; Ex. J)). He states that "the relationship between the need and the amount of force used was also reasonable" and that "[i]n general, if a patient starts to become aggressive, either verbally or physically, staff attempts to deescalate the situation verbally." (*Id.*, pp. 14–15 (citing *id.*, Ex. E, 69:8–71:3)). He continues, stating that "[i]f a patient does, indeed, become violent and start to throw closed-fist punches, charge at staff, or attempt any physical advance or assault on staff, staff place the patient in a physical hold." (*Id.*, p. 15 (citing *id.*, Ex. E, 69:8–71:3)). "If the patient continues to fight, staff then uses cuffs to subdue the patient and make it easier to transport the patient to a restraint room." (*Id.* (citing *id.*, Ex. E, 69:8–71:3)). "Once in a restraint room, the patient is placed in the least restrictive setting, which is generally a four-point restraint" and "then monitored every fifteen (15) minutes in order to make sure that patient is safe while in restraints." (*Id.* (citing *id.*, Ex. E, 69:8–71:3)).

Heins argues that the above procedure was followed; after "staff attempted to verbally deescalate the situation" and tried to remove the towel from Lavonte's head, Heins "recalls Lavonte fighting against the security therapy aides, and not letting the security therapy aides maintain a physical hold." (*Id.*, p. 15 (citing *id.*, Ex. E, 32:23–33:5, 39:5–45:9, 50:24–51:2; Ex. F; Ex. G)). He also argues that Lavonte "did not self-report any injuries as a result of the restraint" and argues that Heins himself does

not meet Lavonte's description of being a "big dude." (*See id.*, pp. 15–16 (citing *id.*,
Ex. A, 67:11–68:4; Ex. D, 117:18–23; Ex, E, 82:3–14; Ex. F; Ex. G)).

In response, Plaintiff Rayford argues that "Defendant Heins' action [sic] were
not objectively reasonable in light of the facts and circumstances." (Doc. 98, p. 9). She
states that "Defendant Heins was subject to discipline, including termination at
Chester Mental Health Center, in approximately 2009 or 2010, after a patient
accused the guards of beating him." (*Id.* (citing *id.*, Ex. H, 10:9–13, 11:14–16)). She
argues that, even though choke holds are forbidden at Chester, that "Lavonte Rayford
testified that that he was choked by the security therapy aide and picked up by his
neck and slammed him on the bed" and that "during the choke hold, he had his hands
up trying to get out of the choke." (*Id.* (citing *id.*, Ex. A, 20:24–25, 21:1, 56:17–19,
68:15–16)). She argues that "there is a genuine issue of material fact as to the
circumstances surrounding the excessive force allegation in Plaintiff's Complaint"
because "Lavonte Rayford testified that he did not take a fighting stance, aggressive
towards anyone [sic]" and "further testified that he did not refuse to take the towel
off of his head, but was trying to tell them to call his mom, his doctor, or the County
(McClain County) because they have proof that he has permission to wear the towel
on his head." (*Id.* (citing *id.*, Ex. A, 33:5–9, 71:6–14, 73:23–25)). She states that,
according to Heins's deposition, "[a]t no point did Defendant Heins see Lavonte
Rayford take a swing at anybody or ball up his fist, but rather just stood up
'abruptly.'" (*Id.*, p. 10 (citing *id.*, Ex. H, 11–16)). Plaintiff Rayford argues that
Defendant Heins "reached at Lavonte Rayford to pull the towel off of his head, at

which point Lavonte stood up abruptly. The unnecessary, physical contact was initiated by Defendant Heins and caused Lavonte Rayford, an individual with a tragic history of trauma, to stand up abruptly." (*Id.*). Plaintiff Rayford notes that the surveillance video from the date in question was lost when the hard drive on which it was stored crashed. (*See id.*, p. 11 (citing Ex. I)). She also indicates that Defendant Heins's allegation that Lavonte did not self-report any injuries is inaccurate because Lavonte "informed his mother and guardian of the incident, as well as his injuries, on the phone" and "[t]he next day, August 15, 2019, Lavonte reported the incident and his injuries to the nursing staff and completed incident report, which triggered an OIG investigation." (*Id.*). Finally, Plaintiff Rayford argues that the fact that Defendant Heins is six feet tall and approximately 275 pounds classifies him as the "big dude" that Lavonte alleges choked him. (*See id.*, p. 11 (citations omitted)).

Recall that *Kingsley*, the case that originated the two-step Fourteenth Amendment violation framework, was an excessive force case. *See* 576 U.S. 389, 396–97 (2015). *Kingsley* identifies two distinct state-of-mind issues that must be addressed: (1) "the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world" and (2) "the defendant's state of mind with respect to whether his use of force was 'excessive.'" *Kemp v. Fulton County*, 27 F.4th 491, 495 (7th Cir. 2022) (quoting *Kingsley* at 395). When the parties do not dispute that the conduct in question occurred, the plaintiff "need show only that a defendant's conduct was

'objectively unreasonable.'" *Kemp*, 27 F.4th at 495 (quoting *Hardeman v. Curran*, 933

F.3d 816, 824 (7th Cir. 2019)).

Defendant Heins argues that he was not the person who allegedly applied a

chokehold to Lavonte. (*See* Doc. 86, p. 15). In his deposition, Lavonte (who is 6'2" tall)

stated that his alleged assailant was white, taller than him, and "heavyset" with "like

a wide body and heavy arms, like say he was a good 350-plus." (Doc. 86, Ex. A, 67:7–

68:4). Heins argues that he "is a 6'0 white male, and would have weighed around 275

pounds in 2019 so he does not meet the description of Lavonte's alleged attacker."

(*Id.*, p. 15 (citing *id.*, Ex, E, 82:3–14)). Plaintiff Rayford does not dispute Lavonte's

testimony or argue that he was mistaken on his own height or about his alleged

assailant's height and weight—she merely argues that Lavonte was sitting on a bed

and that "Kyle Heins was 6'0 and approximately 275, which can certainly be classified

as a 'big dude.'" (Doc. 98, p. 11 (citations omitted)). Construing the facts in Plaintiff

Rayford's favor, the description of a heavyset, Caucasian man over six feet tall is a

plausible description of Defendant Heins, especially from the perspective of a seated

person. Whether or not Defendant Heins was the person who choked Lavonte is an

issue that should be determined by the finder of fact. Thus, this Court will assume

for the purposes of this analysis that Lavonte reasonably alleged that Kyle Heins was

the person who choked him.

Plaintiff Rayford also points to an investigation of Heins from over a decade

prior to the incident in question. (*See* Doc. 98, p. 9 (citing *id.*, Ex. H, 10:9–13, 11:14–

16)). However, Defendant Heins testified in his deposition that after the Office of the

Inspector General "did the investigation and it concluded and there were allegations against me and other [security therapy aides], everybody got terminated based off those allegations. Then the union went back and they had to review the case, and then I got my job back because it was unfounded." (Doc. 85, Ex. E, 10:9–15). He testified that "[a] patient of -- the patient was accusing us of having beat him. That was what he said, 'they beat me.' Which didn't happen" and that "the video showed me doing nothing. So they really didn't have a leg to stand on with me. So that is why I got my job back." (*Id.*, 11:14–16, 18–22). Thus, this argument does not hold water.

Without the video camera footage, this case is a battle of credibility between Lavonte and Defendant Heins, which indicates the presence of a genuine issue of material fact sufficient to survive the Defendants' Motion for Summary Judgment. Looking at this claim holistically and construing all instances in Plaintiff Rayford's favor, it is possible that a reasonable jury could conclude that Lavonte was aggressively put into a physical hold using excessive force when he refused to remove the towel from his head. Whether the use of force in this situation was excessive is governed by the objective standard in *Kingsley*. None of the security therapy aides present can recall exactly what Lavonte said or did to warrant physically restraining him—Heins indicates that Lavonte was swearing and shouting at them before becoming aggressive while Lavonte insists that he did nothing to initiate such a response and claims that he actually removed the towel from his head before being choked and restrained. However, the incident reports filed by the security therapy aides involved in the incident with Lavonte indicate that he struck staff with closed

fists and that Eric Wingerter's right shoulder and arm were injured in the altercation. (*See* Doc. 86, Ex. F). In his deposition, Wingerter indicates that he was eventually diagnosed with a torn labrum in his shoulder, an injury for which he filed a worker's compensation claim and eventually needed surgery to resolve. (*See* Doc. 86, Ex. H, 28:1–30:14). Additionally, Plaintiff Rayford does not dispute any of the Defendants' Undisputed Material Facts, apart from the date of the incident in question. (*See* Doc. 98, pp. 1–2; *see also* Doc. 86, pp. 3–8). Five men were involved in the restraint, one of whom suffered a shoulder injury to the point of needing surgery. (*See* Doc. 86, Ex. H, 28:1–30:14). Plaintiff Rayford does not dispute the fact that it took multiple adult men to restrain Lavonte or that Wingerter was seriously injured as a result; in fact, she does not address or mention *any* of these facts in her response to the Motion for Summary Judgment.

Considering the above, the excessive force claim turns on whether the force used was reasonable. While there are no Seventh Circuit cases directly on point, the Sixth Circuit has held that "[t]he use of a chokehold on an unresisting—and even an initially resistant—detainee violates the Fourteenth Amendment." *Coley v. Lucas County*, 799 F.3d 530, 540 (6th Cir. 2015) (*citing Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993)). "It is a constitutional violation for law enforcement officials to use violent physical force 'totally without penological justification.'" *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). Moreover, "[a] chokehold rendering an arrestee unconscious and causing his death constitutes excessive force under Fourth

Amendment standards." *Coley*, 799 F.3d at 540 (citing *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999); *Papp v. Snyder*, 81 F.Supp.2d 852, 857 (N.D. Ohio 2000); *Haynes v. Marshall*, 887 F.2d 700, 703 (6th Cir. 1989)).

In *Coley*, the Sixth Circuit determined that the plaintiff's Fourteenth Amendment rights were violated because the defendant in question "chose to act in a manner that Plaintiffs plausibly allege was the product of frustration and anger, designed to punish and cause harm rather than a good faith effort to maintain discipline." *Coley*, 799 F.3d at 540–41. Although the plaintiff "admittedly began to 'squirm around' and struggle, at the point [the defendant] choked him [, the plaintiff] had been placed on the bed, handcuffed to it, and was surrounded by multiple officers." *Id.* at 541. "In that situation, force as extreme as a chokehold was excessive and impermissible, and by the point [the defendant] heard [the plaintiff] choke and gurgle and another officer urged [the defendant] to release the chokehold, [the defendant]'s conduct was clearly objectively unreasonable." *Id.*

Plaintiff Rayford insists that Heins was the aggressor, not Lavonte, yet curiously does not dispute the Defendants' Undisputed Material Facts section (apart from the date of the incident). She does not dispute that Heins intentionally restrained Lavonte (whether the towel was removed from his head in advance of the restraint or not). Even so, Plaintiff Rayford must demonstrate that "a reasonable person would recognize that the use of force was objectively unreasonable under the circumstances." *Kemp v. Fulton County*, 27 F.4th 491, 496 (7th Cir. 2022) (citing *Kingsley*, 576 U.S. at 396–97).

Considering the above, this Court holds that there is a genuine issue of material fact that precludes summary judgment on this claim, based on the totality of the evidence and taking all of the facts in the light most favorable to Plaintiff Rayford. Put another way, it is possible that a reasonable factfinder could determine that the force employed to restrain Lavonte was unreasonable and that Heins's conduct was not objectively reasonable. For this reason, the excessive force claim against Defendant Heins survives the Defendants' Motion for Summary Judgment.

### III. Failure to Intervene (Defendants Rider and Heins)

The Seventh Circuit has identified the elements of a Fourteenth Amendment failure-to-protect claim as follows:

> (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries.

*Echols v. Johnson*, 105 F.4th 973, 978 (7th Cir. 2024), *reh'g denied*, No. 22-3230, 2024 WL 3992502 (7th Cir. Aug. 29, 2024) (quoting *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022)).

The Defendants argue that because "Plaintiff's excessive force claim fails, so does the failure to intervene claim." (Doc. 86, p. 17). They insist that because "no excessive force was used against Lavonte, Plaintiff cannot establish that Defendants failed to intervene" and that "[f]urthermore, Defendant Rider did not even witness Lavonte's restraint." (*Id.* (citing *id.*, Ex. D, 32:15–22)). "She came to the infirmary

after Lavonte was already restrained to assist with the restraint paperwork." (*Id.* (citing *id.*, Ex. D, 36:3–11)).

Plaintiff Rayford argues that "[t]aking the evidence in the light most favorable to Plaintiff, a choke hold being applied is a clear violation of Chester Mental Health policies and Lavante [sic] Rayford's constitutional rights." (Doc. 98, p. 12). "Defendant Heins was present inside this small room in which the altercation occurred and "was the supervisor of the Security Therapy Aides who were involved in the altercation with Lavone Rayford." (*Id.*). She argues that "[n]ot only did he have every opportunity to intervene to prevent injury to Lavonte Rayford, but he was also the individual who instigated the altercation by reaching for the towel on Lavonte Rayford's head." (*Id.*). Additionally, she argues, "[a]s the supervisor, he was trained and in a position to de-escalate the situation, intervene to prevent the use of excessive force, and prevent additional injuries to Lavante [sic] Rayford."

To begin, Defendant Rider states that she was not present when Lavonte was physically restrained, a fact that Plaintiff Rayford neither disputes nor refutes in her Response to the pending Motion for Summary Judgment. (*See* Doc. 86, p. 17 (citing *id.*, Ex. D, 32:15–22, 36:3–11)). Rayford has, thus, offered no evidence to refute Rider's assertion that she was not present during Lavonte's restraint and, thus, had no involvement whatsoever in the circumstances which Rayford alleges constituted excessive force. Clearly, then, the failure to intervene claim against Rider does not survive the Defendants' Motion for Summary Judgment and must be dismissed.

Regarding Defendant Heins, a failure to protect claim can be argued in the alternative to an excessive force claim. *See, e.g., Cornell v. Village of Clayton*, 691 F. Supp. 3d 608, 622 (N.D.N.Y. 2023) ("Indeed, 'district courts have allowed excessive force and failure to intervene claims to proceed in the alternative beyond the summary judgment stage.'" (quoting *Franco v. City of Syracuse*, 2019 WL 1410348, at *4 (N.D.N.Y. Mar. 28, 2019)); *Conforti v. City of Franklin*, 559 F. Supp. 3d 815, 819 (E.D. Wis. 2021). As discussed *supra*, Defendant Heins argues that he is not the individual who restrained Lavonte because his physical statute does not comport with Lavonte's description. *See supra* Section II. Thus, this Court will construe this claim as being raised in the alternative for the purposes of the instant analysis.

Either way, this claim survives Defendant Heins's arguments for the same reason as the excessive force claim; there is a genuine issue of material fact regarding whether or not Heins's actions were objectively reasonable. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). Staff at Chester attempted to deescalate the situation with Lavonte and were forced to utilize restraint because of concerns for their safety. Similar to the force used in *Echols*, this Court holds that the finder of fact could determine that reasonable security therapy aide in Heins's position could have perceived there to be a high risk of serious harm associated with restraining Lavonte and could determine that the evidence suggests that Heins could have taken different measures to protect Lavonte. *But see* 105 F.4th 973 at 980 ("In the final analysis, we are unable to conclude that a reasonable officer in Johnson's, Wallace's, or Logan's position would have perceived the risk of serious harm that Rexroat posed

to Echols. Nor does the evidence suggest that reasonable officers would have taken different measures to protect Echols."). For these reasons, Plaintiff Rayford's failure to intervene survives Heins's Motion for Summary Judgment and will proceed to trial.

However, to be clear, Plaintiff Rayford cannot recover from Defendant Heins on both excessive force and failure to intervene claims. *See Conforti v. City of Franklin*, 559 F. Supp. 3d 815, 820–21 (E.D. Wis. 2021) ("Moreover, I doubt that any of the defendants' cases could reasonably be interpreted to mean that, if an officer has a realistic opportunity to intervene to stop another officer's use of excessive force, and instead of intervening the officer decides to use excessive force of his own, then he is not liable for the injuries inflicted by the other officer. Such an interpretation would lead to perverse results . . . . Instead, what the other district courts likely meant in stating that a direct participant in excessive force is not liable for failing to intervene is that the plaintiff cannot recover twice for the same injury: once on an excessive-force theory and once on a failure-to-intervene theory." (citing *Page v. Chambers*, No. 5:14CV00218, 2015 WL 3964675, at *4 (E.D. Ark. June 29, 2015)).

## IV. Willful and Wanton Lack of Medical Treatment (Defendant Rider)

In analyzing Illinois law, the Seventh Circuit has stated that "[c]onduct is willful and wanton . . . if it constitutes 'a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property.'" *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001). "Illinois recognizes that negligence and willful and wanton conduct are different because 'willful and wanton

conduct carries a degree of opprobrium not found in merely negligent behavior . . . ." *Id.* (first citing *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 531 (Ill. 1992); *Loitz v. Remington Arms Co., Inc.*, 563 N.E.2d 397, 402 (Ill. 1990); then quoting *Burke*, 593 N.E.2d at 532). "Willful and wanton conduct 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.'" *Id.* (citing *Loitz*, 563 N.E.2d at 402). The Seventh Circuit has held that "the standard for assessing whether conduct is willful and wanton is 'remarkably similar' to the deliberate indifference standard." *Id.* (citing *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 n. 13 (7th Cir. 1998)).

Defendant Rider employs the standard of medical malpractice in analyzing Plaintiff Rayford's willful and wanton conduct claim because "[i]n Illinois, there is no separate, independent tort of willful and wanton conduct." (Doc. 86, p. 9 (citing *Krywin v. Chi. Transit Auth.*, 238 Ill. 2d 215, 235 (2010); *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 274 (1994)); *Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Dirs.*, 2012 IL 112479, ¶ 19)). She argues that, "[i]n order to recover damages based on willful and wanton conduct, a plaintiff must plead and prove the basic elements of a negligence claim--that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury." (*Id.* (citing *Krywin*, 238 Ill. 2d at 225)). "In addition, a plaintiff must allege either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." (*Id.* (citing *Doe v. Chi. Board of Educ.*, 213 Ill. 2d 19, 28 (2004))). Rider states

that, in a medical malpractice case, the plaintiff "must present expert testimony to establish all of the following: (1) the applicable standard of care against which defendant's actions may be measured; (2) defendant's deviation from the standard of care; and (3) that the defendant's deviation from the standard proximately caused the plaintiff's injury." (*Id.* (citing *Addison v. Whittenberg*, 124 Ill. 2d 287, 297 (1988); *Purtill v. Hess*, 111 Ill. 2d 229, 241–42 (1986); *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 896 (1st Dist. 1990); *Diggs v. Suburban Medical Center*, 191 Ill. App. 3d 828, 833 (1st Dist. 1989))).

Defendant Rider argues that "Plaintiff cannot demonstrate that Defendant Rider breached any duty owed to Lavonte with respect to Dilantin" because she "did not adjust Lavonte's Dilantin dosage or make any decisions regarding the amount or frequency of the administration of Dilantin to Lavonte while he was housed at Chester." (Doc. 86, p. 10 (citing *id.*, Ex. D, 15:14–17; 24:11–25:19)). She argues that "[h]er only interaction with Lavonte arose from assisting with the restraint paperwork" and that "Plaintiff has no expert testimony whatsoever that any of the actions, or inactions, of Defendant Rider breached the accepted medical standard of care in the community." (*Id.* (citing *id.*, Ex. D)). She also notes that "[i]t is well settled that if a plaintiff fails to come forward with expert testimony of a violation of the appropriate standard of care, summary judgment is proper." (*Id.* (citing *Smith v. Bhattacharya*, 2014 IL App (2d) 130891, ¶ 20; *Rohe v. Shivde*, 203 Ill. App. 3d 181, 192–93 (1st Dist. 1990); *Smock v. Hale*, 197 Ill. App. 3d 732, 738 (4th Dist. 1990); *Bennet v. Raag*, 103 Ill. App. 3d 321, 327 (2d Dist. 1982))).

Plaintiff Rayford argues that "in contrast to Defendant's contention in her Motion for Summary Judgment, Plaintiff can prove each element of willful and wanton misconduct against the Defendant Rider." (Doc. 98, p. 2). She argues that "Defendant Rider appeared more involved than merely restraint paperwork" because "[s]pecifically, her signature appears on Lavonte Rayford's Admission Treatment Plan where chronic seizure disorder is listed as a chronic medical condition for Lavonte" and "also appears on the Consent for Medication." (*Id.*, p. 3). Rayford argues that, as a nurse, "Defendant Rider had a duty to thoroughly and accurately document Lavonte Rayford's patient file, obtain consent from the patient's guardian, and ensure that Lavonte Rayford was receiving proper medical treatment." (*Id.*). She argues that Rider breached her duty "[b]y failing to accurately follow the wishes of the guardian in terms of medication administration." (*Id.*). Rayford also argues that Rider's deposition testimony conflicts with her signature on Lavonte's admission documentation. (*Id.*, p. 4 ("However, despite signing that she 'personally examined' Lavonte Rayford, Defendant Rider testified that, while she signed the document, she never personally examined Lavonte during the physical hold and/or within 15 minutes of the initiation of mechanical restraint or seclusion." (citing *id.*, Ex. F, 78:9–19))). Rayford asserts that "[i]f nurses believe that a patient is being mistreated or instructions are not being properly followed, nurses are required to use the chain of command" and that "[h]ere, Defendant Rider had actual knowledge that the patient notes were not accurate, and Latasha Rayford did not consent to changes in Lavonte

Rayford's medication." (*Id.*, p. 5). Rayford argues that "[t]he breach of this duty was also the proximate cause of Plaintiff's injury." (*Id.*).

Here, as in her constitutional claim related to Lavonte's medical care *(see supra* Section I), Plaintiff Rayford insists that the relevant injury is *all of the medical care* (or, as alleged, the lack thereof) that Lavonte received while at Chester. However, in a medical malpractice claim, the plaintiff must point toward a *specific* injury that resulted from inadequate medical care. As discussed above, the relevant injury is Lavonte's alleged Dilantin toxicity that resulted from his stay at Chester. Defendant Rider has argued that she was not responsible for adjusting Lavonte's Dilantin prescription.

Notably, Plaintiff Rayford argues that "if Defendant Rider had accurately notated the conversation with Latasha Rayford or the medical records of Lavonte Rayford, *additional providers who relied on this information would have recognized* that 'changing the medication right off the bat' was not appropriate, proper, or consented to" and that "if Defendant Rider had utilized the chain of command to notify supervisors *that the providers' decision to modify Lavonte's medication* was against both medical advice and the wishes of his guardian, his injuries could have been prevented." (Doc. 98, p. 6 (emphasis added)). Thus, even in her argument, Plaintiff Rayford concedes that other providers were responsible for changing Lavonte's Dilantin prescription, not Defendant Rider. Furthermore, Plaintiff Rayford does not dispute Defendant Rider's assertion that expert testimony is required to prove the standard of care in the community. (*See* Doc. 86, p. 10 (citations omitted)).

Therefore, Plaintiff Rayford's willful and wanton conduct claim does not survive scrutiny, either, and must be dismissed.

## V. Qualified Immunity

The Defendants also argue that they are protected by qualified immunity because "the record in this case demonstrates that Defendants did not violate any of Plaintiff's constitutional rights. For the Court to hold otherwise against these Defendants would subject them to a heightened standard of liability that was not clearly established at the timeframe relevant to Plaintiff's allegations." (Doc. 86, pp. 17–18). Plaintiff Rayford disagrees, arguing that "every security therapy aid [sic] and nurse questioned about choke holds stated that they were improper, dangerous to inmates, and specifically not allowed at Chester Mental Health Center" and that "[e]very reasonable person knows that choke holds or grabbing residents by the throat violates the rights of residents." (Doc. 98, p. 13). She also argues that "[b]ecause a reasonable nurse in Defendant Rider's position should or would have understood that she was violating Lavante [sic] Rayford's constitutional and statutory rights by ignoring the wishes of his health care decisionmaker, showing deliberate indifference to Lavante's [sic] serious medical conditions." (*Id.*, p. 14).

"Qualified immunity is an affirmative defense, but once it is raised the burden shifts to the plaintiff to defeat it." *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020) (citing *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001)). "To overcome qualified immunity, the facts viewed in the light most favorable to [the plaintiff] must 'show that the defendant[s] violated a constitutional right' and that

'the right was clearly established at [that] time.'" *Id.* (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017)).

First, because none of Plaintiff Rayford's claims against Defendant Rider survive the Defendants' Motion for Summary Judgment, this Court need not assess whether or not qualified immunity would apply.

Regarding the claims directed against Defendant Heins, this Court held *supra* that genuine issues of material fact precluded summary judgment on the excessive force and failure to intervene claims. Thus, taking the facts in the light most favorable to Plaintiff Rayford, a reasonable jury could determine that there were constitutional violations that occurred. Moving to the second step, Defendant Heins testified in his deposition that he was aware that chokeholds were prohibited at Chester. (*See supra* Section II). He certainly was aware of the escalation of force policy at Chester and that nonviolent deescalation was required prior to resorting to restraint. Therefore, this Court holds that Heins is not entitled to qualified immunity for the excessive force claim.

Moving to the failure to intervene claim, Defendant Heins is not protected by qualified immunity, either. The elements of a failure to intervene claim have been established in the Seventh Circuit for at least thirty years. *See Conforti v. City of Franklin*, 559 F. Supp. 3d 815, 820 (E.D. Wis. 2021) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). As discussed *supra*, Heins was aware of the policies at Chester and that excessive force was prohibited; even if he was not the person who restrained Lavonte, he certainly knew of the policies at Chester prohibiting excessive

force and requiring deescalation. Therefore, a reasonable jury could find that he violated Lavonte's constitutional rights and Heins was clearly aware of the limits of the force that could be used against detainees as evidenced by his experience and knowledge of the policies at Chester. Therefore, he is not immunized from liability for the failure to intervene claim.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgement filed by Defendants Sherri Rider and Kyle Heins is **GRANTED in part and DENIED in part**. Summary judgment is **GRANTED** regarding the claims against Defendant Rider alleged in Counts I, II, and III of Plaintiff Latasha Rayford's Complaint; these claims are **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to terminate Sherri Rider as a Defendant in this action. Summary judgment is **DENIED** regarding the failure to intervene and excessive force claims alleged against Defendant Heins in Counts III and IV; these claims will proceed to trial. This Court will set a status conference at a later date to set firm dates for a final pretrial conference and jury trial. In the meantime, the parties are encouraged to discuss whether a settlement conference would be beneficial and, if so, to request a referral to a magistrate judge for that purpose.

**IT IS SO ORDERED.**

**DATED: March 3, 2025**

**/s/ Stephen P. McGlynn**
**STEPHEN P. McGLYNN**
**U.S. District Judge**